STATE OF MAINE
CUMBERLAND, ss

BUSINESS AND CONSUMER COURT
LOCATION: Portland
Docket No.: BCD-CV-14-30

FIRST TRACKS INVESTMENTS, LLC )
                                )
            Plaintiff,          )
                                )
    v.                          )
                                )
MURRAY, PLUMB & MURRAY, et al.  )
                                )
            Defendants.         )

**ORDER ON DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT**

Defendants Murray, Plumb & Murray, Christopher Branson, Esq., and Kelly McDonald, Esq., (collectively "Defendants") move for summary judgment on all six counts of Plaintiff First Tracks Investments, LLC's ("First Tracks") First Amended Complaint ("Complaint"). First Tracks' Complaint stems from Defendants' representation of Ms. Sally Merrill and Sunrise Schoolhouse, LLC ("Sunrise") in two underlying actions. Defendants represented Ms. Merrill and Sunrise in a lawsuit initiated by First Tracks seeking a deficiency judgment from the sale of Ms. Merrill and Sunrise's farm (the "Deficiency Suit"), and a lawsuit filed by Deutsche Bank— in which First Tracks subsequently replaced Deutsche Bank—for the foreclosure of Ms. Merrill's home (the "House Foreclosure Suit"). First Tracks alleges that Defendants engaged in wrongful conduct during the underlying representations and assert two counts of wrongful use of civil proceedings against Defendants (Counts I and IV), as well as claims for abuse of process (Count II), fraud (Count III), misrepresentation (Count VI), and tort of another (Count V).

The Court held oral argument on Defendants' Motion for Summary Judgment ("MSJ") on June 9, 2014. For the reasons discussed below, the Court grants Defendants' MSJ on all counts.

## I. BACKGROUND

On April 18, 2008, First Tracks loaned $800,000 to Sunrise. (Plaintiff's Statement of Facts in Opposition to Defendants' Statement of Material Facts ("Pl.'s Opp. S.M.F."), ¶ 3.) Ms. Merrill was the sole member of Sunrise. (Defendants' Statement of Material Facts ("Def.'s S.M.F."), ¶ 2.) The $800,000 loan was secured by a mortgage on Sunrise Acre Farm and personally guaranteed by Ms. Merrill. (*Id.* at ¶ 3.) Sunrise Acres Farm (the "Farm" or "Farm Property") contained approximately 145 acres in the town of Cumberland, Maine. (*Id.* at ¶ 4.) On July 1, 2008 First Tracks granted an allonge in the amount of $50,000 to Ms. Merrill as the sole member of Sunshine. (Pl.'s O.S.M.F., ¶ 3.) Subsequently, on September 2, 2008, First Tracks granted a second allonge to Ms. Merrill as the sole member of Sunshine in the amount of $25,000. (*Id.*)[1]

By notice dated June 25, 2009, First Tracks, through its counsel, served a Notice of Default and Demand on Ms. Merrill. (Pl.'s Additional Statement of Material Facts ("Pl.s A.S.M.F"), ¶ 6.) First Tracks' counsel also prepared a Notice of Mortgagee's Sale of Real Estate on or about December 9, 2009 ("Notice of Sale"). (*Id.* at ¶ 8.) The Notice of Sale contained several errors. (*See* Def.'s Ex. 2, Order on Plaintiff's Motion to Dismiss and Motion for Summary Judgment , 4/8/2012, Horton J., in *First Tracks Investments, LLC v. Sunrise Schoolhouse, LLC and Sally Merrill*, Cumberland County Superior Court, Docket No. BCD-CV-11-31 (the "Deficiency Order"), 4.) The Notice of Sale incorrectly identified the address of an antique schoolhouse as being a part of the sale property, although the Notice did exempt the

---

[1] For the purposes this Order, there is no relevant distinction between Ms. Merrill and Sunrise. Accordingly, the Court will refer to Ms. Merrill individually, and Ms. Merrill and Sunrise collectively, as "Ms. Merrill."

2

schoolhouse property from the description of property being sold. (*Id.*) The Notice also failed to mention the acreage involved or the fact that the property being sold consisted of the Farm. (*Id.*)

David Perkins, an attorney for First Tracks, conducted the Farm sale at about 8:30 a.m. on January 4, 2010. (*Id.* at 5.) The sale took place at the intersection where Cross Road, Range Road and Winn Road meet, where the antique schoolhouse owned by Ms. Merrill stands. (*Id.*) Neither the antique schoolhouse nor the roadway beside it was part of the Farm. (*Id.*) No one else participated or stopped to observe the sale. (*Id.*) Mr. Perkins spoke with Mr. Eric Cianchette, the owner of First Tracks at the time of the Farm sale, by telephone and told him there were no bidders. (Def.'s S.M.F. ¶ 15.) Mr. Cianchette, on behalf of First Tracks, bid $850,000 for the Farm Property. (*Id.* at ¶ 16.) The total amount of debt owed to First Tracks by Ms. Merrill as of January 4, 2010 was $990,023.97. (Def.'s Ex. 2, Deficiency Order, 5.)

Meanwhile, several interested persons had gathered at the barn on the Farm Property based on the reasonable assumption that the Farm sale would be held there. (*Id.* at 6.) Because the schoolhouse cannot be seen from the barn parking area, none of those waiting at the barn were aware that First Tracks' attorney was conducting the Farm sale down the road. (*Id.*) After the group of people had waited for some time at the barn, Ms. Merrill's attorney, James Barnes, was notified that no sale had taken place. (*Id.*) Mr. Barnes thereafter contacted First Tracks' counsel via email to ask what had happened. (*Id.*) At least one other person, not identified in the Deficiency Suit, contacted First Tracks' counsel to complain about not being able to find the sale. (*Id.*) First Tracks' attorneys subsequently filed a post-sale affidavit, took possession of the Farm, and began making improvements thereto. (*Id.*)

3

A.    The Deficiency Suit.

On June 14, 2010, First Tracks filed the Deficiency Suit in the Cumberland County Superior Court alleging that it was owed a deficiency in the amount of $296,972.35, plus interest and other costs and fees, from the Farm sale. (Def.'s S.M.F., ¶ 26.) As part of the Deficiency Suit, First Tracks moved *ex parte* for an attachment on Ms. Merrill's residence (the "House"), which was adjacent to, but not a part of the Farm. (*Id.* at ¶ 27.) Ms. Merrill initially attempted to represent herself *pro se*, but on December 28, 2010 wrote the court asking for additional time to respond to a motion for summary judgment filed by First Tracks in the Deficiency Suit stating:

> I am told I have grounds to oppose the Motion for Summary Judgment because the foreclosure sale was not done properly. The notice of sale didn't describe the location of the sale in a way that could be found by potential bidders. I know of at least three people who were at the main barn at the farm at the time of the sale and could not find the sale. Because the sale was not properly held, they should not get a judgment for a deficiency.

(*Id.* at ¶ 29 (emphasis in original).) Attorney McDonald testified that he understood Ms. Merrill had been to four or five other attorneys before their meeting and that none had decided to represent her. (Pl.'s Ex. 23, Deposition of Attorney McDonald ("McDonald Dep."), 23:25-24:10.) In Attorney McDonald's handwritten notes of options to explore regarding the Deficiency Suit, he wrote "Michael Waxman Jay Sweet Bill Robitzek. Crazy litigator. He'll do it on contingency" and explained that "that was a general category and that that's what I would need to find." (*Id.* at 50:3-6, 53:16-21.) Attorney McDonald's notes reflect that he also considered the following options for Ms. Merrill: filing bankruptcy, instituting incompetency proceedings, and referring her to Pine Tree Legal Assistance. (*Id.* at 46:11-47:10, 50:18-25, 53:3-12.) Attorney McDonald's notes also state "Bluff David Perkins. Get Money and get rid of deficiency." (*Id.* at 50:12-13.) Attorney McDonald's notes further reflect that he considered

4

challenging the Farm sale based on the price of the sale and the site of where the sale was conducted. (Pl.'s Ext. 26, McDonald Handwritten Notes, MPM00426.)

Prior to entering an appearance in the Deficiency Suit, Attorneys Branson and McDonald called Attorney Perkins to set up a meeting. (Pl.'s Ex., 6, Affidavit of Attorney David Perkins ("Perkins Aff."), ¶ 17.) Attorney Perkins claims that Attorneys Branson and McDonald were both "excited" or "amped up" at the meeting and informed Attorney Perkins that they had located a bidder who wanted to bid on the Farm Property, but couldn't find the auction. (*Id.*) Attorneys McDonald and Branson allegedly told Attorney Perkins that First Tracks needed to make this go away or it would be very bad for First Tracks because Defendants would argue the Farm would have sold at a much higher price if the bidder had been able to find the auction. (*Id.*) Attorneys McDonald and Branson also allegedly demanded $150,000 in cash and an opportunity for Ms. Merrill to stay in her house in order for First Tracks to avoid costly litigation and delay. (*Id.*) Attorney Perkins interpreted these comments as a threat to his client that they would be involved in prolonged litigation unless First Tracks accepted Attorneys McDonald and Branson's offer. (*Id.* at ¶ 18.)

Following the meeting, Defendants sent Attorney Perkins a letter dated December 21, 2010, stating that the Farm Property was valued at $2,827,000 on October 10, 2007[2] and that taking into account the $850,000 sale price at the auction, Ms. Merrill had $1.7 million worth of equity in the property that was lost due to the foreclosure. (Def.'s Reply Exhibit 3, Branson Letter to Perkins, MPM EMAIL 00058.) Defendants then proposed to settle the matter on the following terms: "First Tracks pays Sally [Ms. Merrill] $225,000 and releases all claims against

---

[2] Attorney Branson's letter refers to the 2007 appraisal of the Farm as taking place on October 10, 2007, however, Defendants refer to the same appraisal as taking place in September 2007, while First Tracks simply refers to it as the 2007 appraisal. (*See e.g.* Def.'s S.M.F., ¶ 33; Pl.'s A.S.M.F. ¶ 55.) To avoid confusion, the Court will refer to this as the 2007 appraisal.

her. In return, Sally will vacate the [House] property within sixty days, will deed the property to First Tracks, and will release First Tracks from all claims." (*Id.* at MPM EMAIL 00059.)

On or about January 13, 2010, Defendants entered an appearance on behalf of Ms. Merrill in the Deficiency Suit and filed a motion to amend their answer and assert counterclaims. (Def.'s S.M.F. ¶ 30.) Defendants raised defenses to the Deficiency Suit and asserted eight counterclaims on behalf of Ms. Merrill, including: 1) a declaratory judgment that the Farm foreclosure sale was not valid; and 2) a count for "wrongful foreclosure" based upon the alleged loss of equity in the Farm when it was sold at auction. (Def.'s Ex. 9, Ms. Merrill's Amended Answer, Affirmative Defenses, and Counterclaims, 7-10.) Defendants' also claimed that the Farm Property was worth $2.8 million based on the 2007 Appraisal performed by professional appraiser Patricia Ms. Amidon. (*Id.* at 5.)

B.    Norman Mason and the Mason Affidavits.

Prior to entering an appearance, Defendants interviewed witnesses Norman Mason and Medley Watson Jr. who provided affidavits—attached to Ms. Merrill's amended answer, affirmative defenses and counterclaims—that they had attempted to go to the sale, but had been unable to find it. (Def.'s S.M.F. ¶ 37.) Attorney McDonald could not find any notes from this meeting with Mr. Mason and believes that the notes he took were made on his laptop and became Mr. Mason's first affidavit in the Deficiency Suit (the "First Mason Affidavit"). (Pl.'s Ex. 23, McDonald Dep., 78:12-79:7.) Attorney McDonald does not remember whether he spoke with Mr. Mason about how much he was prepared to bid, what he intended to do with the Farm, whether Ms. Merrill owed Mr. Mason money, or whether Mr. Mason had the financial capability to purchase the Farm. (*Id.* at 81:7-83:23.) Instead, Attorney McDonald testified that the key thing about the meeting was "that [Mr. Mason] attempted to go to the sale, it wasn't at the most

6

logical place on the farm for the sale, he couldn't find the sale, and that he had some interest in bidding on the farm if he had found the sale. (*Id.* at 82:8-14.)

As noted, Attorney McDonald prepared the First Mason Affidavit, which Mr. Mason executed on January 1, 2011. (*See* Def.'s S.M.F., ¶¶ 41-43; Def.'s Ex. 5, First Mason Affidavit.) In the affidavit, Mr. Mason stated that he went to the Farm to attend the auction, brought a check for the deposit, and was prepared to bid. (Def.'s Ex. 5, First Mason Affidavit, ¶¶ 4-5.) Mr. Mason further stated that he waited at the main barn of the Farm for over an hour, but never saw attorneys from Perkins Olson or any representatives from First Tracks. (*Id.* at ¶ 7.) Mr. Mason was accompanied in the barn by his son, Larry Mr. Mason, and Medley Watson Jr., who were also looking for the sale. (*Id.* at ¶ 8.)

Subsequently, First Tracks served a subpoena duces tecum for financial information on Mr. Mason. (Defendants' Reply to First Tracks' Additional Statement of Material Facts ("Def.'s R.A.S.M.F."), ¶ 43.) Mr. Mason called Attorney McDonald who thereafter entered into a limited representation of Mr. Mason with respect to objections to First Tracks' document requests and the pending deposition. (Pl.'s Ex. 27, Deposition Transcript of Norman Mr. Mason ("Mr. Mason Dep."), 22:4-10; Pl.'s Ex. 23, McDonald Dep., 191:14-19.) During the deposition, Mr. Mason testified that he brought his checkbook with him to the sale, and would have written out a personal check at the auction if he had bid. (Def.'s Ext. 12, Mr. Mason Dep., 16:8-17:22.) Mr. Mason explained that he was interested in buying the Farm "[i]f it was a good trade," but that the primary reason he went was to protect a loan he made to Ms. Merrill. (*Id.* at 36:13-37:21.) Mr. Mason did not have $50,000 in his checking account to cover the $50,000 deposit, but felt confident he could have moved money around to come up with $50,000. (*Id.* at 17:11-18:9.)

Following the deposition, Attorney Perkins withdrew as counsel for First Tracks in the Deficiency Suit because he believed he would likely become a witness therein regarding the Farm sale. (Def.'s Ex. 13, Deposition of David Perkins ("Perkins Dep."), 13:4-14:15.) Thereafter, First Tracks served Mr. Mason within an amended subpoena, but rather than compelling production of the records, First Tracks accepted a second affidavit from Mr. Mason to satisfy his obligation under the subpoena (the "Second Mason Affidavit"). (Def.'s S.M.F., ¶ 50.) The Second Mason Affidavit provided that Mr. Mason did not go to the sale with the "intention of bidding" on the Farm, and that he did not have enough "liquid funds to purchase the real property for the amount of money [he] underst[ood] it sold for." (Def.'s Ex. 14, Second Mason Aff., ¶¶ 8, 13.) The affidavit further provided that even if Mr. Mason had satisfied the terms contained in the Notice of Sale, he "would have bid no more than $100,000 at the auction[.]" (*Id.* at ¶ 9.) Subsequently, First Tracks' attorneys issued a check to Mr. Mason for $440 and another check for $440 to Mr. Mason's son for reimbursement of the legal fees they incurred preparing the Second Mason Affidavit, (*See* Def.'s S.M.F., ¶¶ 52-53.) In a mediation brief submitted subsequent to the Second Mason Affidavit, Ms. Merrill claims that Mr. Mason arrived at the barn "prepared to bid on the Farm." (Def.'s Ex. 43, Mediation Submission of Ms. Merrill and Sunrise, 4.)

C.     Patricia Amidon and the Farm Property Appraisals.

In the 2007 Appraisal, Ms. Amidon valued the Farm Property at approximately $2.8 million. (Def.'s S.M.F. ¶ 33.) On January 10 and 11, 2011, Attorney McDonald spoke with Ms. Amidon regarding the real estate market and land values in general. (*Id.* at ¶ 56.) During the conversation, Ms. Amidon explained that land values drop the most during a recession. (Pl.'s Ex. 23, McDonald Dep., 63:10-64:16.)

8

Defendants subsequently retained Ms. Amidon to perform a two-phased assignment. (Def.'s S.M.F. ¶ 58.) Under the first phase, Ms. Amidon was to provide "preliminary values of the property…that meets the minimal reporting criteria for USAP by February 11, 2011. (*Id.*; Def.'s Ex. 21, Engagement Letter form Patricia Ms. Amidon, 2.) The second phase was to consist of an "expanded report with final values," which would be "provided at a later time if needed." (*Id.*)

Ms. Amidon completed the first phase of the assignment on March 11, 2011, preliminarily valuing the Farm Property at $1,340,000 (the "3/11/11 Appraisal"). (Def.'s S.M.F. ¶ 65.) First Tracks was aware that Defendants intended to have an updated appraisal performed regarding the value of the Farm Property as of January 4, 2010. (Def.'s Ex. 13, Perkins Dep., 21:22-22:1.) Prior to the expert witness deadline of September 18, 2011, Defendants consulted with another expert appraiser, Al Childs. (Def.'s S.M.F. ¶ 73.) Ultimately, Defendants chose not to designate Mr. Childs. (*Id.*) Instead, Defendants asked Ms. Amidon to prepare a second report. (Def.'s S.M.F. ¶ 74.) Unlike the 3/11/11 Appraisal, Ms. Amidon was asked in the second report to perform opinions of value based upon an assumed division of the property into nine separate economic units. (*Id.*). Prior to asking Ms. Amidon to assume the proposed division of the property, Attorney John Shumadine of Murray Plumb & Murray researched and determined that the Farm could be divided into separate units without requiring subdivision approval. (Def.'s S.M.F. ¶ 75.)

Ms. Amidon provided her second report on the Farm Property on September 15, 2011 (the "9/15/11 Appraisal"). (Pl.'s S.M.F. ¶ 77.) The 9/15/11 Appraisal concluded that when the Farm Property is valued by multiple economic units, rather than as a whole, it is worth approximately $1,785,000. (Pl.'s S.M.F. ¶ 77; Def.'s Ex. 31, 9/15/11 Appraisal). First Track's

Mortgage on the Farm, however, provided that "Grantee may sell the Mortgaged Premises…either as a whole or in parcels together will all improvements that may be thereon, by a public sale." (Pl.'s S.M.F. ¶ 12; Pl.'s Ex. 22, Corporate Mortgage, P. 11 of 20, Sec. 3.10(b).) The 9/15/11 Appraisal also stated that Ms. Amidon reviewed a "prior appraisal dated March 11, 2011 that [she] conducted on the property with a valuation date of January 4, 2010." (Ex. 31 to Def.'s S.M.F., Cover Letter to 9/15/11 Appraisal, p 2.)

Earlier in the litigation, First Tracks had propounded requests for production of documents on Ms. Merrill. (*See* Def.'s Ex. 25, Ms. Merrill's responses to First Tracks' Request for Production of Documents.) Requests 1 and 18 sought documents related to the Farm's value as well as any valuations or appraisals performed thereon. (*Id.* at 1, 5.) Defendants, on behalf of Ms. Merrill, responded to First Tracks' request on March 7, 2011 agreeing to produce responsive documents. (*See id.*) Requests 1 and 18 were not specifically objected to, but Defendants did make a general objection to all requests "to the extent that these requests seek documents protected against disclosure by the attorney-client privilege, Rule 26(b)(3) of the Maine Rules of Civil Procedure, or the work product doctrine." (*Id.* at 1.) On August 3, 2011, an attorney for First Tracks wrote a letter specifically requesting production of certain documents, including those that relate to any valuation and/or appraisal done for the [Farm Property]." (Pl.'s S.M.F. ¶ 65.) Defendants did not produce the 3/11/11 Appraisal to First Tracks at this time. This was allegedly because Ms. Amidon was a consulting expert who had not been designated to testify and that the 3/11/11 Appraisal and Defendants' communications with Ms. Amidon were protected from disclosure by M.R. Civ. P. 26. (*Id.* at ¶ 70.)

On September 19, 2011, First Tracks designated Mark Plourde as an expert witness, who appraised the Farm's value as of January 4, 2010 at $1,440,000. (Def.'s Ex. 33, First Tracks'

Expert Witness Designation of Mark Plourde.) On that same day, Defendants designated Ms. Amidon as an expert witness and produced the 9/15/11 Appraisal to First Tracks. (Def.'s S.M.F. ¶ 77.) The next day, Charles Remmel, an attorney for First Tracks, emailed Attorney McDonald noting the 9/15/11 Appraisal's reference to the 3/11/11 Appraisal. (Pl.'s Ex. 14, MPM EMAIL 01046.) Mr. Remmel stated that he was troubled because he recalled Defendants making representations after March 11, 2011, that the last appraisal of the Farm was carried out in 2007. (*See id.*) Mr. Remmel requested a copy of the 3/11/11 Appraisal, and received a copy on October 5, 2011. (*Id.*; Def.'s S.M.F. ¶ 81.) Defendants also produced Ms. Amidon's notes and file materials after designating her as an expert. (Def.'s S.M.F. ¶ 82.)

On October 26, 2011, Attorney McDonald referenced the 9/15/11 Appraisal in an email stating that "[i]f Ms. Amidon's appraisal is all we have to rely on, she could be undermined by the bulk sale/multiple sale parcel argument." (Pl.'s Ex. 47, MPM Email 03335-6.) Subsequently, First Tracks deposed Ms. Amidon on December 8, 2011, at which First Tracks' counsel questioned Ms. Amidon about the bases for her 9/15/11 Appraisal and the differences between the 3/11/11 Appraisal and the 9/15/11 Appraisal. (Def.'s S.M.F. ¶ 83.) First Tracks did not file a motion for sanctions against Ms. Merrill or Defendants in the Deficiency Suit for any alleged discovery violations or file a motion for Rule 11 violations. (Def.'s S.M.F., ¶ 86.)

D.     The House Foreclosure Suit.

First Tracks purchased the note and mortgage on Ms. Merrill's House from Deutsche Bank, and took over the foreclosure of her home in the House Foreclosure Suit pending in the Cumberland County Superior Court. (Def.'s S.M.F. ¶ 88.) First Tracks filed motions for summary judgment twice in the House Foreclosure Suit while Ms. Merrill defended the case pro se. (Def.'s S.M.F. ¶ 89.) Both motions were denied. (*Id.*) First Tracks filed a third motion for

11

summary judgment in April of 2011. (Def.'s S.M.F. ¶ 92.) Defendants entered an appearance on behalf of Ms. Merrill in the House Foreclosure Suit on May 25, 2011 and filed an objection to the motion, along with a motion to stay the case. (*Id.*) In the motion to stay, Defendants argued that "[t]he [Farm Property] was appraised for $2.8 million in []2007…As of January 4, 2010, the [Farm Property] was encumbered with debt (held by First Tracks) of approximately $1.1 million" and that "Ms. Merrill had equity in the farm worth approximately $1.7 million." (Pl.'s S.M.F. ¶ 107.) Defendants alleged in the motion to stay that "the failure to hold a commercially reasonable sale of the [Farm] deprived Ms. Merrill of substantial equity" and that if it "had been sold on commercially reasonable terms, it would have likely realized sufficient funds to discharge the mortgage on Ms. Merrill's House." (Pl.'s S.M.F. ¶ 108.) First Tracks subsequently withdrew its motion for summary judgment, and the court granted Ms. Merrill's motion to stay on October 13, 2011. (Def.'s S.M.F. ¶¶ 93, 94.)

E.      Disposition of the Deficiency Lawsuit.

On January 25, 2012, First Tracks filed a motion to dismiss and motion for summary judgment on Ms. Merrill's remaining counterclaims. (Def.'s S.M.F. ¶ 96.) First Tracks voluntarily withdrew its deficiency claim against Ms. Merrill at oral argument premised and conditioned on the Deficiency Suit court's intention to rule in First Track's favor on Ms. Merrill's counterclaims. (Def.'s Ex. 2, the Deficiency Order, 7.) Subsequently, on April 13, 2012, Justice Horton issued an order granting summary judgment against Ms. Merrill's counterclaims. (Def.'s S.M.F. ¶98; Def.'s Ex. 2, the Deficiency Order.) The Deficiency Order found in pertinent part that:

>   1) Ms. Merrill and Sunrise sought a legal remedy in the form of damages rather than equitable relief for the allegedly improper foreclosure sale (12, 15)
>   2) The notice of sale of the Farm Property was inaccurate or incomplete in several respects (15-16)

12

3) Ms. Merrill and Sunrise did not present evidence of a qualified bidder (18);
4) Maine has not adopted a rule preferring the sale of property as parcels, over a sale en masse (14);
5) First Tracks was not required to put forth efforts to promote the sale beyond those required by statute (18);
6) Nothing in the record suggested any bidder would have bettered First Tracks' $850,000 bid (18); and
7) As a result Ms. Merrill and Sunrise have not offered evidence on the basis of which a reasonable factfinder could find in their favor as to either causation or damages on their counterclaims (19-20).

(Def.'s Ex. 2, Deficiency Order.)  The Deficiency Order resolved all remaining claims in the

Deficiency Suit.  (*See id.* at 7.)

## II. Discussion

"To survive a defendant's motion for a summary judgment, the plaintiff must establish a

prima facie case for each element of [their] cause of action." (*Bonin v. Crepeau*, 2005 ME 59, ¶

8, 873 A.2d 346.)  "The function of a summary judgment is to permit a court, prior to trial, to

determine whether there exists a triable issue of fact or whether the question[s] before the court

[are] solely…of law." (*Bouchard v. American Orthodontics*, 661 A.2d 1143, 44 (Me. 1995).)

Summary judgment is appropriate where there are no genuine issues of material fact and the

moving party is entitled to judgment as a matter of law.  (M.R. Civ. P. 56(c); *see also Levine v.*

*R.B.K. Caly Corp.*, 2001 ME 77, ¶ 4, 770 A.2d 653.)  A "material fact" is one that can affect the

outcome of the case, and a genuine issue exists when there is sufficient evidence for a fact finder

to choose between competing versions of the fact.  (*Lougee Conservancy v. City-Mortgage, Inc.*,

2012 ME 103, ¶11, 48 A.3d 774.)

Summary judgment is also appropriate if, looking at the record in the light most favorable

to the non-moving party and drawing all reasonable inferences in that party's favor, no

reasonable juror could find for the non-moving party.  (*Id.* at ¶ 14, n. 3 (quoting *Scott v. Harris*,

550 U.S. 372, 377 (2007)).)  This is true "even when concepts such as motive or intent are at

13

issue…if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." (*Dyer. v. Dep't. of Transp.*, 2008 ME 106, ¶ 14, 951 A.2d 821 (quoting *Vives v. Fajardo*, 472 F.3d 19, 21 (1st Cir. 2007)); *Bouchard v. American Orthodontics*, 661 A.2d 1143, 1144-45 (Me. 1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986)) ("If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted").) Accordingly, a "judgment as a matter of law in a defendant's favor is proper when any jury verdict for the plaintiff would be based on conjecture or speculation." (*Stanton v. Univ. of Maine System*, 2001 ME 96, ¶ 6, 773 A.2d 1045.)

Motions for summary judgment must be supported by citations to record evidence of a quality that would be admissible at trial. (*Levine*, 2001 ME 77, ¶ 6, 770 A.2d at 656 (citing M.R. Civ. P. 56(e).) Facts supported by record citations in a supporting or opposing statement of materials facts are deemed admitted unless properly controverted. (M.R. Civ. P. 56(h)(4); *see also Farrell v. Theriault*, 464 A.2d 188, 194 (Me. 1983).) When ruling on a motion for summary judgment, courts are only required to consider "the portions of the record referred to, and the material facts set forth, in the parties' statement of material facts to determine whether there is no genuine dispute of material fact." (*Lubar v. Connelly*, 2014 ME 17, ¶ 34, 86 A.3d.)

A.     The Court Need Not—and Does Not—Reach Defendants' Arguments That First Tracks' Has No Private Cause of Action Under Any Count of the Amended Complaint.

Defendants raise two arguments they assert dispose of every count in First Tracks' Complaint. First, Defendants argue Maine law does not recognize a right of action against opposing counsel for fraud or misrepresentations based on court filings or litigation conduct. (Def.'s MSJ, 16.) Second, Defendants assert that the litigation privilege bars all of First Tracks'

14

claims. (*Id.* at 19.) Maine law does not offer a definitive answer to these questions.[3] Due to this uncertainty, and because Defendants are entitled to summary judgment on each of First Tracks' causes of action on an individual basis, the Court need not—and does not—address these arguments.

B.  Summary Judgment is Warranted against First Tracks' Fraud and Misrepresentation Claims Because No Reasonable Juror Could Find First Tracks Justifiably Relied on Defendants' Allegedly Fraudulent Misrepresentations.

First Tracks asserts two separate counts based on fraud (Count III) and misrepresentation (Count IV). First Tracks' fraud claim is premised on the 3/11/11 Appraisal, while its misrepresentation claim involves the 3/11/11 Appraisal and the Mason Affidavits. (First Tracks Amended Complaint, ¶¶ 90-93, 103-108, 19-40.)

In order to establish fraud and misrepresentation causes of action First Tracks must demonstrate by clear and convincing evidence that: (1) Defendants made a false representation; (2) of a material fact; (3) with knowledge of its falsity or in reckless disregard of whether it is true or false; (4) for the purpose of inducing First Tracks to act in reliance upon it; and (5) that First Tracks justifiably relied upon the representation and acted upon it to its damage. (*Barr v. Dyke*, 2012 ME 108, ¶ 16, 49 A.3d 1280.) Justifiable reliance is not present where the plaintiff acts contrary to the alleged fraud or misrepresentation. (*See Linscott v. State Farm Mut. Auto. Ins. Co.*, 368 A.2d 1161, 1164-65 (Me. 1977) ("The added expense to plaintiff of securing Virginia counsel was an incident of defendant's appropriate exercise of his own legal rights as an adversary and not the result of reliance by plaintiff on misrepresentations of fact by defendant insurance company"); *see also* Simmons, Zillman, & Gregory, *Maine Tort Law* § 11.06 (2004

---

[3] To the extent Defendants are seeking to extend the litigation privilege, this argument must fail as this Court does not have the authority to create new privileges. (*See Citizens Communication Co. v. Attorney General*, 2007 ME 114, ¶¶10-14 and n. 2.)

15

ed.) ("Maine cases require a showing of justifiable reliance. The element is clearly lacking where the plaintiff acts contrary to the representation" (citing *Linscott*, 368 A.2d at 1164-65)).)

      1.     *Misrepresentations Arising From the First Mason Affidavit.*

First Tracks asserts that Defendants "knowingly and intentionally provided false information" as to whether Mr. Mason was a qualified bidder at the Farm sale. (First Tracks Amended Complaint, ¶¶ 31-36.) The allegedly false information stems from the First Mason Affidavit. There, Mr. Mason stated that he went to the sale prepared to bid on the Farm and that he brought a check for the deposit with him. (Def.'s Ex. 5, Mr. Mason Aff., ¶ 5.) Relying on this information, Defendants claimed that Mr. Mason brought "a check in the amount of $50,000 (the deposit required by the Notice of Sale to bid) and was prepared to bid on the Farm. (Def.'s Ex. 9, January 13, 2011 Counterclaim, ¶ 9; January 13, 2011, Objection to First Track's Motion for Summary judgment, 2.)[4] Following Defendants' submission of this affidavit, First Tracks served a subpoena duces tecum for financial information on Mr. Mason. (Pl.'s A.S.M.F. ¶ 43.) Attorney McDonald agreed to represent Mr. Mason on a limited basis to object to First Tracks' document requests and to represent him in the deposition First Tracks' scheduled. (Pl.'s Ex. 27, Mr. Mason Dep., 22:4-10; Pl.'s Ex. 23, McDonald Dep., 191:14-19.) Based on revelations made during the deposition, First Tracks' attorneys served Mr. Mason with an amended subpoena, but rather than compelling production of the records, First Tracks accepted a second affidavit from Mr. Mason. (Def.'s S.M.F. ¶¶ 49-50.) In the second affidavit, Mr. Mason testified that he did not go to the sale with the intention of bidding on the Farm and that he did not have enough liquid funds to purchase the property. (*Id.* at ¶ 51.) The affidavit further provides that even if Mr.

---

[4] First Tracks also cites to statements allegedly made in Defendants' Statement of Material Facts of February 23, 2012, but did not provide a copy of the alleged documents in the record.

16

Mason were a qualified bidder at the auction, he "would have bid no more than $100,000 at the auction[.]" (Def.'s Ex. 14, Second Mason Aff., ¶ 7.)

Viewing the facts in the light most favorable to First Tracks, the Court finds that no reasonable juror could find First Tracks relied upon the alleged misrepresentations in the First Mason Affidavit or any statements stemming therefrom. To the contrary, First Tracks challenged those representations by issuing a subpoena duces tecum, deposing Mr. Mason, and working with Mr. Mason to issue a second affidavit partially contradicting the first affidavit. Accordingly, there is no genuine issue of material fact as to whether First Tracks justifiably relied on the alleged misrepresentations in, or arising out of, the First Mason Affidavit.

2. *Fraudulent and Misrepresentative Statements Connected to the 3/11/11 Appraisal.*

First Tracks' also asserts that they relied on Defendants' representations that they had provided all appraisals for the Farm Property when, in fact, they had not disclosed the 3/11/11 Appraisal. (First Tracks' Complaint, ¶¶ 90-91.) In particular, First Tracks points to statements made in the Deficiency Suit after the 3/11/11 Appraisal that the "Farm was last appraised in [] 2007 at a value of $2,837,000" and that there was "equity in the amount of approximately $1.8 million." (*E.g.* Pl.'s Ex. 28, Ms. Merrill and Sunrise Amended Counterclaims in Deficiency Suit, ¶¶ 5, 22.) First Tracks asserts that Defendants' did not disclose the 3/11/11 Appraisal to force First Tracks to incur litigation expenses and to delay the litigation to keep Ms. Merrill in her House. (*Id.* at ¶ 93.)

Similar to the statements contained in and arising out of the First Mason Affidavit, no reasonable juror could find that First Tracks relied on Defendants' alleged representations regarding the appraisals and value of the Farm. Indeed, rather than rely on these statements,

17

First Tracks retained their own expert to evaluate and contradict the statements. (Def.'s Ex. 33, First Tracks' Expert Witness Designation of Mark Plourde.)

In tacit recognition, First Tracks attempts to shift the inquiry by arguing that its retention of an appraiser to value the Farm Property *was* their justifiable reliance. (Pl.'s Opp. to MSJ, 39.) This type of reliance, however, was rejected by the Law Court in *Linscott*. The Court held that the plaintiff's claim of deceit failed as a matter of law because even if there was a misrepresentation, "the complaint reveals the plaintiff did not rely upon such misrepresentation but defied it." (368 A.2d 1161, 1164-65.) The plaintiff defied the representation by securing counsel to prosecute the underlying claim. (*Id.*) "The added expense to plaintiff of securing Virginia counsel was an incident of defendant's appropriate exercise of his own legal rights as an adversary and not the result of reliance by plaintiff on misrepresentations of fact by defendant insurance company." (*Id.*) Accordingly, assuming for the sake of argument that Defendants wrongfully withheld the 3/11/11 Appraisal and made misrepresentative statements, First Tracks' retention of an appraiser and continued litigation regarding the Farm's value does not constitute justifiable reliance as a matter of law.

For these reasons, summary judgment is warranted against First Tracks' fraud and misrepresentation causes of action because it cannot demonstrate justifiable reliance.

C.    Summary Judgment is Warranted Against First Tracks' Tort of Another Claim as a Matter of Law.

In Count V of the Complaint, First Tracks seeks attorneys' fees, costs and interest incurred in the Deficiency and House Foreclosure Suits arguing the Defendants' tortious conduct required First Tracks to bring and defend "actions against a third party." (First Tracks'

18

Complaint, ¶¶ 101, 102.) The American rule, however, provides that "absent a statutory provision or contractual agreement litigants bear their own attorney fees and litigation costs." (*Colquhoun v. Webber*, 684 A.2d 405, 413 (Me. 1996.).) First Tracks does not assert any statute or contract as the basis for its claimed attorney fees and costs. Instead, First Tracks argues that its fits within the "tort of another" exception as recognized in *Gagnon v. Turgeon*, 271 A.2d 634, 635 (Me. 1970).

The status of the "tort of another" exception, also known as the collateral litigation exception, in Maine is uncertain. In *Soley v. Karll*, the Law Court noted that "Maine has not recognized the collateral litigation exception to the American rule..." (2004 ME 89, ¶ 11 n.3, 853 A.2d 775.) In *Gagnon*, however, the Law Court espoused what appears to be the collateral litigation exception, without labeling it as such. (*See* 271 A.2d at 635.) This Order treats the collateral litigation exception as recognized in Maine in substance, if not in name.

The collateral litigation exception provides that "[w]here the wrongful act of a defendant has involved the plaintiff in litigation with others, or placed him in such relation to others as makes it necessary for him to incur expense to protect his interest, such costs and expenses, including attorneys' fees, must be treated as the legal consequence of a wrongful action and may be recovered as damages." (*Gagnon*, 271 A.2d at 635; *see also* Restatement (Second) of Torts § 914 (1977).) *Gagnon*, however, recognized an important limitation to the collateral litigation exception. Namely, the exception "does not apply to attorneys' fees incurred in litigation between the plaintiff and defendant, or between persons in privy to the contract agreement or events through which the litigation arises. (*Id.* at 635-36 (citing *Armstrong Constr. Co. v. Thomson*, 390 P.2d 976 (Wash. 1964)).)

19

The cited *Armstrong Construction* opinion explains the rationale for both the exception and the limitation on the exception as follows:

> In those actions, where the acts or omissions of a party to an agreement or event have exposed one to litigation by third persons—that is, to suit by persons not connected with the initial transaction or event—the allowance of attorney's fees may be a proper element of consequential damages….The fulcrum upon which the rule balances, then, is whether the action, for which attorney's fees are claimed as consequential damages, is brought or defended by third persons-that is, persons not privy to the contract, agreement or events through which the litigation arises."

(*Id.* at 979.)

Here, the fulcrum upon which the exception balances tilts against First Tracks. Assuming for the sake of argument that First Tracks has stated a valid cause of action premised on the collateral litigation exception —whether as a stand-alone claim or for tortious interference with prospective economic advantage as First Tracks intimates in its MSJ Opposition—summary judgment is still warranted because the collateral litigation exception does not apply. This is because the "third party" referenced in the Complaint is Ms. Merrill. (Pl.'s Opp. to MSJ, 44.) Defendants, as Ms. Merrill's attorneys in the underlying suits, are clearly privy to Ms. Merrill's actions therein. Going a step further, the heart of First Tracks' Complaint is premised on actions and representations allegedly carried out by Defendants, not Ms. Merrill. (*See id.* at 43, n.32.) Therefore, viewing the facts in the light most favorable to First Tracks, no reasonable juror could conclude the Defendants were third parties or not privy to the underlying events in the Deficiency and House Foreclosure Suits. Accordingly, summary judgment is warranted against First Tracks' tort of another claim as a matter of law—as either a stand-alone cause of action or as a theory under which to recover for an intentional interference with prospective economic

20

advantage[5]—because the collateral litigation exception does not apply and First Tracks is barred by the American rule from recovering the attorney's fees, time, and other expenditures incurred in the underlying suits.

D.    Summary Judgment is Warranted Against First Tracks' Wrongful Use of Civil Proceedings Claim Because Defendants Had Probable Cause and No Reasonable Juror Could Find Defendants Pursued an Improper Primary Purpose.

First Tracks asserts two counts against Defendants for wrongful use of civil proceedings. (First Tracks' Complaint, Counts I and IV.) Count I claims Defendants' assertion and continued litigation of its counterclaims in the Deficiency Suit was a wrongful use of civil proceedings because they lacked probable cause to pursue their claims. Count IV is similar to Count I, but focuses on Defendants' assertion of defenses in the Deficiency and House Foreclosure Suits.

Defendants argue that there is no evidence to support any of the elements of a wrongful use of civil proceedings claim. (Defendants' MSJ, 31.) The elements are: (1) one initiates, continues, or procures civil proceedings without probable cause; (2) with a primary purpose other than that of securing the proper adjudication of the claim upon which the proceedings are based; and (3) the proceedings have terminated in favor of the person against whom they are brought. (*Pepperell Trust Co. v. Mountain Heir Financial Corp.*, 1998 ME 46, ¶ 15, 708 A.2d 651, 656 (adopting the Restatement (Second) of Tort's definition of wrongful use of civil proceedings).)

---

[5] Damages are an essential element of a tortious interference with prospective economic advantage claim. *See Rutland v. Mullen*, 2002 ME 98, ¶ 13, 798 A.2d 1103 ("Tortious interference with prospective economic advantage requires a plaintiff to prove (1) that a valid contract or prospective economic advantage existed; (2) that the defendant interfered with that contract by fraud or intimidation; and (3) that such interference caused damages").)

1.    *Whether Defendants Had Probable Cause to Pursue the Deficiency Suit Counterclaims and the Defenses in the House Foreclosure and Deficiency Suits.*

The determination of whether probable cause exists is a question of law. (Restatement (Second) of Torts § 673 cmts, e and h.) In wrongful use of civil proceedings claims, a jury has no function regarding the probable cause determination unless there is a conflict in the testimony about the circumstances under which the defendant acted in initiating the filing or proceedings. (*See id.*) In that case, the jury determines what the defendant did or did not do, and under what circumstances the act or omission occurred. (*Id.*) The court then determines whether, under those circumstances, the defendant had probable cause. (*See id.*)

Probable case is present if a party has "a reasonable belief in the possibility that the claim may be held valid. (Restatement (Second) of Torts § 674 cmt. e (1977) (cited to by *Morse Bros., Inc. v. Webster,* 2001 ME 70, ¶ 22, 772 A.2d 842); *see also Tobin v. Liberty Management, Inc.,* 2004 WL 1433631 * 2 (Me. Sup. Ct. 2004, J. Mead) (citing Restatement (Second) of Torts § 675).) "[W]hile the person initiating civil proceedings cannot have a reasonable belief in the existence of the facts on which the proceedings are based if he knows the alleged facts are not true and his claim is based on false testimony, it is enough if their existence is not certain but he believes that he can establish their existence to the satisfaction of court and jury." (Restatement (Second) of Torts § 675 cmt. d.) Many civil proceedings, in order to be effective, "must be begun before all of the relevant facts can be ascertained to a reasonable degree of certainty. To put the initiator of civil proceedings to a greater risk of liability would put an undesirable burden upon those whose rights cannot be otherwise effectively enforced." (*Id.*)

Similarly, "[i]f the legal validity of a claim is uncertain, the person who initiates the civil proceeding may believe that his claim is meritorious, but he can have no more than an opinion

22

that the chances are good that the court might decide to uphold it." (*Id.* at cmt. f.) In that instance:

> The question is not whether he is correct in believing that the court would sustain the claim, but whether his opinion that there was a sound chance that the claim might be sustained was a reasonable one. To hold that the person initiating civil proceedings is liable unless the claim proves to be valid, would throw an undesirable burden upon those who by advancing claims not heretofore recognized nevertheless aid in making the law consistent with changing conditions and changing opinions. There are many instances in which a line of authority has been modified or rejected. To subject those who challenge this authority to liability for wrongful use of civil proceedings might prove a deterrent to the overturning of archaic decisions.

(*Id.*)

First Tracks offers an expansive argument in support of its claim that Defendants lacked probable cause because there was never evidence of causation or damage in support of their defenses and counterclaims. (Pl.'s Opp. to MSJ, 22.) In support, First Tracks points to the following alleged facts: 1) Defendants knew that four or five other law firms had rejected the case before it came to them; 2) Attorney McDonald wanted to shop the case around for a "crazy litigator" to take the case on contingency; and 3) Defendants explored bankruptcy, incompetency and other options such as referring the case to Pine Tree Legal Assistance as opposed to litigation. (*Id.* at 23-24.) Instead of pursuing these options, First Tracks contends Defendants settled on trying to "bluff" First Tracks' attorney and threatening to "hassle" First Tracks through prolonged litigation if First Tracks didn't provide Ms. Merrill housing and money. (*Id.* at 24.)

First Tracks also argues Defendants filed the counterclaims without any evidence as to the Farm's value after being advised that property values had plummeted since 2008 and that liquidation (auction) value was 50-70% of fair market value. (*Id.* at 25.) Then, after filing the counterclaims, Defendants received the 3/11/11 Appraisal, valuing the Farm at $1.34 million. (*Id.*) Applying a 70% liquidation value, First Tracks argues the Farm's value was $938,000,

23

which was approximately $50,000 less than the amount owed on the mortgage note. (*Id.*) As a result, First Tracks argues Defendants lacked probable cause because there was no evidence of damages from the foreclosure sale. Furthermore, as the litigation progressed, Defendants hired Appraiser Al Childs in June 2011. (*Id.* at 26.) Mr. Childs opined that liquidation value was between 50-65% of fair market value and that banks were reporting they ended up purchasing properties held at auction in 99% of foreclosures. (*Id.*). First Tracks further argues the 9/15/11 Appraisal lacked a valid legal foundation and did not support Defendants' claim for damages. (*Id.* at 26-28.) Taking all of this together, First Tracks claims Defendants' knew they could not recover damages from the Farm sale.

First Tracks also argues Defendants had no evidence of causation in support of their counterclaims. (*Id.* at 28.) In particular, First Tracks argues that from the outset, Mr. Mason was not a qualified bidder, nor was there any evidence that he was. (*Id.* at 29.) Furthermore, after Mr. Mason's deposition and the Second Mason Affidavit clarified that he: 1) did not have a certified check; 2) did not have $50,000 in his checking account; and 3) would not have bid more than $100,00 for the Farm, there was no question that there were no qualified bidders for the Farm sale. (*Id.* at 29.)

Finally, First Tracks argues that genuine issues of fact exist as to whether Defendants' had probable cause to believe the auction was conducted improperly, as the only statements regarding the auction process in the Deficiency Order were dicta. (*Id.* at 30-31.)

Defendants respond that their counterclaims had merit as evidenced by the Deficiency Order. (Def.'s MSJ, 32.) In particular, Defendants' argue that their counterclaim only failed regarding a matter of first impression on one element. (*Id.*)

24

Here, viewing the evidence in the light most favorable to First Tracks, the Court finds the Defendants had probable cause to initiate and pursue the counterclaims and defenses in the Deficiency Suit. The Court agrees that other law firms turning down Ms. Merrill's case and Defendants' exploration of other options before agreeing to represent Ms. Merrill—including "bluffing" First Tracks—presents some evidence that Ms. Merrill's case lacked merit. When viewing the evidence in the record as a whole, however, the Court is persuaded that Defendants had a reasonable belief in the possibility that the counterclaims and defenses could be held valid.

Prior to entering an appearance and asserting counterclaims on behalf of Ms. Merrill, Defendants were aware of the 2007 Appraisal valuing the Farm Property at $2,827,000. (Def.'s Reply Ex. 3, Branson Letter to Perkins, MPM EMAIL 00058.) While Defendants were—or should have been—aware that the Farm Property's value dropped since the 2007 Appraisal, it is clear that Defendants had a reasonable belief that their wrongful foreclosure claim could establish some amount of damages at the time they initiated the action. This remains true even after Defendants received the 3/11/11 Appraisal and consulted with Mr. Childs. Appraisals are expert statements of opinion about a property's value. The fact that one expert provided an opinion that the Farm Property was not worth more than the Farm sold for does not make it unreasonable for Defendants' to believe another appraiser would value the Farm higher. To find Defendants lacked a reasonable belief that their claim could possibly be valid based on unfavorable expert witness opinions of fact would create a dangerous precedent opening the flood gates for spurious litigation from unhappy litigants. (*See Bradbury v. GMAC Morg. LLC,* 780 F.Supp.2d 108, 111 (D. Me. 2011) (warning against rulings that would permit an unhappy litigant in one action to seek damages in a separate action in virtually every lawsuit.)

In addition, the Defendants had a sound chance that the basis of the 9/15/11 Appraisal might be sustained as a reasonable basis for the defenses and wrongful foreclosure counterclaim. Although the mortgage provides that the Farm Property may be sold as a whole or in parcels it cannot be said that Defendants' lacked probable cause to assert the Farm should have been sold in parcels. This is because even though Maine has not adopted a rule preferring the sale of property in parcels over a sale en masse, other states have. (*See* Def.'s Ex. 2, Deficiency Order, 14 (citing *Applefield v. Fid. Fed. Sav. & Loan Ass'n of Tampa*, 137 So.2d 259, 261 (Fla. App. 1962)).) Furthermore, Defendants carried out legal research determining that the 9/15/11 Appraisal was not prohibited from being sold, and valued by multiple economic units. (Def.'s S.M.F. ¶ 75.) Accordingly, Defendants possessed probable cause in spite of the 9/15/11 Appraisal because the sale by parcels was possible and Defendants sought to pursue that possibility through an argument for a new interpretation of Maine law. (Restatement (Second) of Torts § 675 cmt. f.)

Similarly, Defendants had probable cause to pursue their counterclaims even though there was no qualified bidder at the Farm Sale. Defendants apparently argued in the Deficiency Suit that First Tracks should have put forth additional efforts to advertise and generate interest in the sale. (Def.'s Ex. 2, Deficiency Order, 18.) The Deficiency Suit court found this theory plausible, but rejected the legal argument that First Tracks was under an affirmative duty to make efforts to publicize the property or the sale beyond publishing the statutorily required notice. (*Id.*) Similarly, while the Deficiency Suit court found Defendants' evidence regarding what the bid price should have been—or the lack thereof—insufficiently persuasive, this does not mean Defendants' lacked probable cause to make the argument. (*Id.* at 19.)

26

Finally, First Tracks argument that Defendants lacked probable cause to believe the Farm sale was conducted improperly is flatly contradicted by the Deficiency Order which held that the Notice of Sale contained several inaccuracies, including "the fact that the actual location of the sale was contrary to the published location...." (*Id.* at 15.) These statements were not dicta.

Accordingly, the Court finds Defendants are entitled to summary judgment on First Tracks' wrongful use of civil proceedings cause of actions because the Defendants had probable cause to initiate and pursue their defenses and counterclaims.

2. *No Reasonable Juror Could Find Defendants Opposed the Deficiency and House Foreclosure Suits and Pursued the Deficiency Suit Counterclaims For an Improper Primary Purpose.*

The Restatement (Second) of Torts sets forth a number of situations where civil proceedings were initiated for an improper primary purpose. (Restatement (Second) of Torts § 676 cmt. c.) The situations include when a party: 1) does not believe his claim is meritorious; 2) pursues the action solely to harass the opposing party; and 3) pursues the action solely to delay proceedings. (*Id.*)

First Tracks claims Defendants filed the counterclaims solely to harass First Tracks into reaching a settlement that had no relation to the merits of the claim; and 2) to delay proceedings to allow Mr. Ms. Merrill to stay in her house longer. (Pl.'s Opp. to MSJ, 31-32.)

Defendants respond that they asserted the counterclaims because had they not, the claims would have been waived. (Def.'s MSJ, 32-33.) In addition, Defendants argue it was reasonable to believe that they could prevail on their counterclaim. (*Id.* at 33.)

Here, viewing the facts in the light most favorable to First Tracks, the Court accepts that the Defendants were motivated, at least in part, by a desire to keep Ms. Merrill in her house and

27

obtain a favorable settlement for her. These purposes, however, are not improper. [6] First, Defendants' allegedly improper attempts to "extort" a settlement are wholly consistent with the Deficiency Suit counterclaim that First Tracks owed Ms. Merrill money for a wrongful foreclosure. Similarly, Defendants' allegedly improper attempt to keep Ms. Merrill in her house was consistent with contesting the sought after attachment of the House in the Deficiency Suit. If Ms. Merrill defended on her wrongful foreclosure claim, she hoped to use the money she obtained to pay off the mortgage on her House. (Def.'s Ex. 40, Entry of Appearance, Objection to Motion for Summary Judgment and Motion to Stay in the House Foreclosure Suit ("Motion to Stay the House Foreclosure Suit"), 4.) As discussed above, the Court has found as a matter of law that Defendants had probable cause to pursue these claims.

In addition, Defendants represented Ms. Merrill on a contingency basis. (Pl.'s Ext. 23, McDonald Dep. 164:12-15.) When an attorney represents a client on a contingency basis, the attorney only recovers money if the client prevails. Here, the fact that Defendants would only be paid for their services if they prevailed in their counterclaims weighs against First Tracks' claim that Defendants primary purpose in instituting the counterclaims was to delay proceedings. Accordingly, no reasonable juror could find Defendants defended the Deficiency and House Foreclosure Suits and Pursued the Deficiency Suit counterclaims for a primary, improper purpose.

E.     Summary Judgment is Warranted Against First Tracks' Abuse of Process Claim Because No Reasonable Juror Could Conclude That Defendants' Used Court Documents or Process in an Improper Manner.

---

[6] The Court would also note that First Tracks' suggestion that it was improper to keep Ms. Merrill in her home long after she had defaulted runs contrary to recent Maine legislative enactments and judicial rules of Civil Procedure which set exacting standards for lenders who attempt to foreclose upon defaulting homeowners. While one could argue the wisdom of such provisions, it cannot be denied that those laws and rules have the undeniable effect, for better or worse, of doing just what Ms. Merrill sought in part to do through the deficiency suit, which was to remain in her home as long as she could while she litigated these matters.

28

In order to state a cause of action for abuse of process, the plaintiff must demonstrate that the defendant: 1) initiated or used a court document or process, in a manner not proper in the regular conduct of proceedings; 2) with the existence of ulterior motive; 3) resulting in damages to the plaintiff. (*Tanguay v. Asen*, 722 A.2d 49 (Me. 1998).)

First Tracks alleges Defendants' committed an abuse of process based in part on discovery abuses arising from the fraudulent misrepresentations and omissions asserted in First Tracks' fraud and misrepresentation claims. (*See* First Tracks' Complaint, ¶¶ 79-80, 84-85.) More broadly, First Tracks argues that Defendants affirmative defenses and counterclaims in the Deficiency Suit constituted an abuse of process. (*See id.* at 36-37.) These actions were allegedly carried out for the improper, collateral purposes of keeping Ms. Merrill in possession of her House for as long as possible and attempting to coerce a settlement agreement. (First Tracks' Opp. to Def.'s MSJ, 38.)

Defendants' argue that First Tracks' claims fail as a matter of law because they do not involve "process." (Defendants' MSJ, 26-28.) Defendants' also argue the alleged process was not used improperly or with an ulterior motive. (*Id.* at 28-30.) Finally, Defendants argue there is no evidence that First Tracks suffered damages as a result of the alleged abuses of process. (*Id.* at 30-31.) Assuming for the sake of argument that Defendants utilized "process," the Court nevertheless finds summary judgment is warranted against First Tracks' because no reasonable juror could conclude the process was utilized in an improper manner.

1. *Whether Defendants' Counterclaims and Affirmative Defenses Can Serve As the Basis for an Abuse of Process Claim.*

Maine law indicates that the filing of a complaint—or counterclaim or affirmative defense—is a regular use of process, but can serve as the basis for an abuse of process claim if it is used for an immediate purpose other than that for which it was designed and intended. In

29

*Advanced Const. Corp. v. Pilecki*, the Law Court explained that "[t]he filing of a lawsuit qualifies as a regular use of process and cannot constitute abuse of process, even if the filing was influenced by an ulterior purpose." (2006 ME 84, ¶ 23, 901 A.2d 189 (citing *Tanguay*, 1998 ME 277, ¶ 5, 722 A.2d 49).) Although *Advanced Construction* appears to stand for the general proposition that the filing of a complaint cannot serve as the basis for an abuse of process claim, a closer inspection reveals a more nuanced rule.

*Tanguay*, upon which *Advanced Construction* relies for the aforementioned proposition, cites to *Potter, Prescott, Jamieson & Nelson, P.A. v. Campbell*, 1998 ME 70, ¶ 7,708 A.2d 283 ("*Campbell*"), and *Simon v. Navon*, 71 F.3d 9 (1st Cir. 1995) ("*Simon*") for support. (1998 ME 277, ¶ 5, 722 A.2d 49.) *Campbell* notes that *Simon* and its holding are consistent with Maine decisions which involve abuse of process claims. (1998 ME 70, ¶ 7, 708 A.2d 283.) Specifically *Campbell* approved of *Simon's* assertion that "[f]iling of a lawsuit is a 'regular' use of process, and therefore may not on its own fulfill the requirement of an abusive act, even if the decision to sue was influenced by a wrongful motive, purpose or intent." (*Id.* (quoting *Simon*, 71 F.3d at 16).) *Simon*, however, also explained that an improper use of process "for an immediate purpose other than that for which it was designed and intended" may serve as the basis for an abuse of process claim. (*Id.* at 15 (quoting Restatement (Second) of Torts § 682 (1977).) Accordingly, *Simon* recognized that "a defendant who explicitly threatened to file a baseless lawsuit solely for the purpose of forcing the plaintiff's action in an unrelated matter, and then did commence suit, could be held liable for [abuse of process or malicious prosecution]." (*Id.*)

*Simon's* interpretation is consistent with the Law Court's decision in *Saliem v. Glovsky*, which explained that for abuse of process claims, "[t]he test is probably, whether the process has been used to accomplish some unlawful end, or to compel the defendant to do some collateral

30

thing which he could not legally be compelled to do." (132 ME 402, 172 A. 4, 6.) "The gist of [an abuse of process claim] consists in the unlawful use of a lawful process. The bad intent must culminate in an actual abuse of the process by perverting it to a use to obtain a result which the process was not intended by law to effect. Regular use of process can not constitute abuse, even though the user was actuated by a wrongful motive, purpose or intent." (*Id.*)

Accordingly, the counterclaim and affirmative defenses raised by Defendants on behalf of Ms. Merrill can serve as the basis for an abuse of process claim if First Tracks can demonstrate they were filed for an immediate purpose other than that for which they were designed and intended.

2. *Whether a Reasonable Juror Could Find Defendants' Counterclaims and Affirmative Defenses Were Filed for an Immediate Purpose Other than that For Which They Were Designed and Intended.*

Viewing the facts in the light most favorable to First Tracks, the Court finds no reasonable juror could conclude Defendants filed the counterclaims and affirmative defenses for an immediate purpose other than their intended purpose. For the purposes of the present motion the Court accepts First Tracks' argument that Defendants were motivated, at least in part, by a desire to keep Ms. Merrill in her House and obtain a favorable settlement from First Tracks. This, however, does not demonstrate an improper purpose. Defendants' allegedly improper attempts to obtain a settlement are wholly consistent with their counterclaims that First Tracks owed Ms. Merrill money for a wrongful foreclosure.

Similarly, Defendants' actions to delay the House Foreclosure Suit were not used for an immediate improper purpose. Defendants sought to stay the House Foreclosure Suit because they had probable cause to believe Ms. Merrill could obtain a settlement or award to pay off the House mortgage based on First Tracks' allegedly wrongful foreclosure. (Def.'s Ex. 40, Motion

31

to Stay the House Foreclosure Suit, 4.) No reasonable juror could find that Defendants' advocacy against First Tracks' House Foreclosure and Deficiency Suits is not a perversion of the judicial process. While the lawsuit was undoubtedly stressful and clearly very expensive for First Tracks, vigorous assertions of claims and defenses and claims on behalf of a client, when supported by probable cause, is exactly the function of attorneys in our justice system. Furthermore, as previously discussed, Defendants represented Ms. Merrill on a contingency basis and would have no economic motive to delay proceedings.

Accordingly, summary judgment is warranted against First Tracks' abuse of process claim to the extent it is premised on Defendants' counterclaims and affirmative defenses.

3.  *Whether Defendants' Alleged Discovery Abuses Can Serve As the Basis for an Abuse of Process Claim.*

Maine law is unclear whether discovery abuses constitute process sufficient to support an abuse of process claim. In *Howison v. Morgan*, the Superior Court held that "[u]nsuccessful attempts to obtain writs of attachment, wrongful failures to comply with discovery, and unsuccessful (even if repeated) filings of motions-even spurious motions-do not constitute a legal basis for the tort of abuse of process." (2000 WL 33676156, *2 (Me. Super. Jan. 3, 2000).) Instead, the proper remedy is to seek sanctions from the court in the underlying case. (*Id.*) While the Maine federal district echoed the sentiment in *Howison* that certain discovery processes, such as false affidavits and certifications in support of a motion for summary judgment do not constitute "process" under Maine law, it cited to contrary case law indicating discovery abuses can serve as the basis for an abuse of process claim. (*Bradbury,* 780 F.Supp.2d at 111 n.11.) *Bradbury* stated:

> Generally the term refers to "legal process" invoking state power such as a subpoena, attachment, and a mechanic's lien. [S]ome of the cases, however, refer to "discovery" as "process," e.g. *Advanced Constr. Corp. v. Pilecki*, 2006 ME 84,

32

901 A.2d 189, 197 (Me. 2006) ("abuse of process claims can…arise from the misuse of the procedures for obtaining a lien" and also "when litigants misuse individual legal procedures, such as discovery, subpoenas, and attachment after a lawsuit has been filed.") Arguably the Law Court was referring there to discovery filings that invoke state power in demanding a response, such as a notice of deposition, the filing of interrogatories, or a request for admissions. I do not resolve here whether the filing of an affidavit or certification meets the definition of process.

(*Id.*) *Advanced Construction*, cited by *Bradbury*, relies on *Pepperell Trust Co. v. Mountain Heir Fin. Corp.* (2006 ME 84, ¶23, 901 A.2d 189.) *Pepperell*, in turn, cites to *Simon, supra,* in support of its claim that "[t]ypical abuse of process cases involve misuses of such procedures as discovery, subpoena, and attachment." (1998 ME 46, ¶ 14 n. 8, 708 A.2d 651 (quoting *Simon*, 71 F.3d at 15).) *Simon* explains that:

> Typical abuse of process claims involve the misuse of such procedures as discovery, *see Twyford v. Twyford*, 63 Cal.App.3d 916, 923-34, 134 Cal.Rptr. 145, 148-49 (1976); subpoenas, *see Board of Education of Farmingdale Union Free Sch. Dist.*, 38 N.Y.2d [397,] 403-04 [1975]; and attachment, *see Saliem v. Glovsky and Fogg*, 132 Me. 402, 404, 172 A. 4 (1934).

(71 F.3d at 15.) *Twyford*, upon which *Simon* relies found that interrogatories and depositions constitute "process." (63 Cal.App.3d 916, 923-24, 134 Cal.Rptr. 145 (following *Barquis v. Merchants Collection Association, supra*, 7 Cal.3d 94, 104 n.4 at 94 n.4 (pointing out that "process" has been broadly interpreted to include the entire range of procedures incident to litigation)).) In light of the preceding authorities, the Court will assume—without deciding—that Defendants' alleged discovery abuses constitute "process."

4.    *Whether Defendants' Alleged Discovery Abuses Were Carried out in a Manner Not Proper in the Regular Conduct of Proceedings*

*Bradbury*, as discussed above, questioned whether allegedly false affidavits and certifications in support of a motion for summary judgment constituted "process." (780

33

F.Supp.2d at 111 n.11.) Ultimately, *Bradbury* determined that it need not reach that issue because:

> Even if the challenged affidavits and certificates used here are "process" their use in the Maine proceedings as alleged in the Amended Complaint does not satisfy *Advanced Construction's* "improper" use requirement. They were used to win the foreclosure lawsuits, and that is a proper use of such documents. If they were false (false documents and testimony are a deep concern to any judge or court) then the proper remedy is to seek to vacate the judgment that was obtained, not to start a new lawsuit alleging abuse of process. A contrary ruling would mean that the outcome of every lawsuit could produce a later lawsuit by the unhappy loser, seeking damages on account of the outcome of the former lawsuit and claiming that it resulted from false testimony or false affidavits. For that same reason, Maine law accords an absolute privilege against liability in later lawsuits for 'statements made in the course of judicial proceedings."

(780 F.Supp.2d at 111 (footnote omitted).)

Here, viewing the facts in the light most favorable to First Tracks—which requires assuming that Defendants purposefully framed Mr. Mason's affidavit to mislead First Tracks and that Defendants improperly and intentionally withheld the 3/11/11 Appraisal—no reasonable juror could find the alleged abuses were carried out in an improper manner. Instead, the alleged abuses were carried out to further Ms. Merrill's interests in the House Foreclosure and Deficiency suits.

Furthermore, First Tracks had an opportunity to raise these alleged abuses in the Deficiency Suit, and seek sanctions or other appropriate remedies therein. Those remedies could have included an award of counsel fees, the same fees which First Tracks seeks for damages in this lawsuit. The Court did not find persuasive First Tracks' counsel's argument as to why remedies, including an award of counsel fees, were not sought before the Single Justice who handled the Deficiency Suit.

The Court has concluded that existing Maine law does not permit First Tracks to bring these claims seeking a remedy it could have sought in the underlying action. As *Bradbury* notes,

a contrary ruling would mean that any unhappy litigant could always bring a subsequent lawsuit alleging discovery abuses in a prior lawsuit, and would set a precedent that many courts have been reluctant to encourage.

### III. Conclusion

The Court concludes that Defendants are entitled to summary judgment on all six counts of First Tracks' Complaint.

The entry will be: Defendants Motion for Summary Judgment is GRANTED.

Pursuant to M.R. Civ. P. 79(a), the Clerk is hereby directed to incorporate this Order by reference in the docket.

Dated: September 8, 2014

_____
Justice Michaela Murphy
**Business and Consumer Court**

Entered on the Docket: 9.8.14
Copies sent via Mail___Electronically ✓

35

**First Tracks Investments, LLC v. Murray, Plumb & Murray, Kelly W. McDonald, Esq. and Christopher B. Branson, Esq.**

**BCD-CV-14-30**


**First Tracks Investments, LLC**
       **Petitioner / Plaintiff**

       Counsel:                    Thomas Hallett, Esq.
                                   75 Market St., Suite 502
                                   PO Box 7508
                                   Portland, ME 04112-7508



**Murray, Plumb & Murray, Kelly W. McDonald, Esq. and Christopher B. Branson, Esq.**
       **Respondents / Defendants**

       Counsel:                    Peter Detroy, Esq.
                                   Two Canal Plaza
                                   PO Box 4600
                                   Portland,  ME 04112-4600